The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 *************
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. St. Paul Insurance Company is the carrier on the risk.
4. Plaintiff's average weekly wage at the time in question was $620.00, yielding a compensation rate of $413.35 per week.
5. Plaintiff has been out of work since 12 November 1996.
6. The issues to be resolved are:
 a. Was plaintiff injured by accident or specific traumatic event arising out of and in the course of his employment on 12 November 1996?
 b. If so, is plaintiff entitled to compensation for incapacity to earn wages of any kind beginning 12 November 1996 and continuing for necessary weeks?
c. If so, is plaintiff entitled to medical benefits?
7. The parties agreed to a bifurcation of the liability claim from the benefits claim. Therefore, only issue (a) is addressed herein.
8. Plaintiff's Exhibits 1 through 21 are admitted in evidence either by stipulation of the parties or the testimony of witnesses.
9. The undersigned takes judicial notice of the original Form 18 and transmittal letter of 19 November 1996, copied to defendant-employer.
 *************
Based upon the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is an unmarried man without children who was born on 29 June 1960. He was graduated from high school during 1979. He went to work for J.P. Stevens as a textile worker when he was 18 years old.
2. Plaintiff was involved in a high speed automobile accident during 1979, which resulted in the partial paralysis of his vocal cords. He was so seriously injured, he was unable to work for one year following the accident.
3. Plaintiff worked with his brother-in-law as a carpenter until 1986 when he began working as a pipe fitter. Pipe fitting jobs offer temporary full-time employment to journeymen pipe fitters and welders who act as independent contractors for principal contractors or owners. After contract pipe fitting work ends, an employee customarily draws unemployment compensation or goes to work for another independent contractor.
4. Plaintiff enjoyed hunting and fishing during his periods of layoff and was able to manage to survive on unemployment compensation during these periods.
5. Defendant-employer was an independent contractor for Champion International Corporation in Roanoke Rapids during 1996 for the purpose of installing replacement pipes, valves and other apparatus to the equipment and vessels used in paper manufacturing. Defendant-employer was hired to work during a shut-down.
6. Shut-downs at Champion International Corporation operations are preplanned and declared for the purpose of making necessary repairs, performing needed maintenance and replacing pipes, valves and other apparatus used in the paper production process. Shut-downs are intense, pressure filled times for independent contractors and their employees. Champion paper is eager for the repair and maintenance to be done so as to recommence the profitable paper manufacturing process.
7. There is a premium on speed during a shut down. Employees of defendant-employer were threatened with termination for failure to meet time goals.
8. Plaintiff began working for defendant-employer in early 1996 at the Champion International owned facility in Roanoke Rapids. Plaintiff's assigned crew began working at a planned shut-down on 10 November 1996.
9. Plaintiff's shift began at 7:00 a.m. and ended at 7:00 p.m. He was expected to do hard manual labor replacing pipes and valves with all due speed. His foreman was a man named George Hubbard.
10. Plaintiff asserted at the time of trial that he was injured at an accident at work while under pressure to replace a valve within a certain period of time on 12 November 1996. He alleges that as an 800 pound pipe was being hoisted into place at about 11:30 a.m., the valve slipped in its choker and struck plaintiff in the chest or abdomen. The blow allegedly propelled plaintiff through an opening in the wall that was covered with a tarp or fire blanket. Plaintiff went down on one knee but recovered and continued working to the end of his shift.
11. Plaintiff did not think he was hurt although his back was sore a little bit when the shift ended. Plaintiff recalls telling his foreman, George Hubbard, that he could not work overtime that evening because a pipe had hit him and his back was hurting.
12. Hubbard does not recall plaintiff's comments about the pipe hitting him. Mel Brooks, a co-employee of plaintiff, who was standing near plaintiff and Hubbard has no such recollection either.
13. Plaintiff stated at the hearing that he was unable to get out of bed the next morning, 13 November 1996, due to back and leg pain. Therefore, he was not on his front porch awaiting a ride to work.
14. Plaintiff did not have a drivers' license and usually rode to and from work with a co-worker. When plaintiff's co-worker stopped outside his house on 13 November, he blew the horn for plaintiff who uncharacteristically was not sitting on the porch. When plaintiff did not come to the door on 13 November 1996, the co-worker left and drove to work.
15. Plaintiff was a reliable worker and almost always reported for work on time. When he did not report for work on 13 November, George Hubbard became concerned. Mr. Hubbard called plaintiff at his girlfriend's house. The son of plaintiff's girlfriend answered the phone and advised Mr. Hubbard that plaintiff was not there.
16. Plaintiff was scheduled for layoff on 14 November because his job at defendant-employer's was ending. On the morning of 14 November, plaintiff had arranged for a different co-worker than usual to stop by and pick him up. When the co-worker arrived, plaintiff came outside and asked his co-worker to tell Mr. Hubbard that he would not be in because he had hurt his back. The co-worker so informed Mr. Hubbard when he got to the job.
17. Defendant-employer had notice of the injury to plaintiff not later than 14 November 1996, based upon the testimony of several witnesses at trial.
18. Defendant-carrier denied liability by Form 61 dated 19 November 1996 based upon the alleged refusal of plaintiff to cooperate with an investigation.
19. Plaintiff, driven by his girlfriend, arrived at the job site at approximately 10:30 a.m. on 14 November to pick up his paycheck. She was required to be at work some 25 to 30 minutes away by noon.
20. While at the job site on 14 November, plaintiff participated in two meetings to discuss his alleged back injury of 12 November. The first meeting was attended by the safety director, Mike Cekovsky; his foreman, George Hubbard; and Tommy Johnson. The meeting was continued in the office of the on-site manager, Jan Estep, and was also attended by plaintiff, Mr. Cekovsky, Mr. Hubbard and Ms. Estep.
21. During the course of the meetings, plaintiff was asked to give a recorded statement to a representative of defendant-employer's carrier. He refused to do so prior to consulting with his attorney.
22. During the course of the meetings, Mr. Cerkovsky made an appointment for plaintiff to be examined by Dr. Frazier, at 12:45 p.m. Plaintiff advised that he could not attend the appointment because his girlfriend had to be at work at noon. Plaintiff declined other offers of transportation.
23. Plaintiff was also asked to submit to a urine drug screen mandated by the defendant-employer's procedures for all reported on-the-job injuries. The drug test would have been conducted in the safety office. Plaintiff also refused to submit to the drug screen giving no explanation for his refusal.
24. Plaintiff's reports and medical histories when he ultimately sought medical assistance are relatively consistent although the exact location of the place on his body struck by the pipe varies.
25. Plaintiff initially sought treatment for symptoms of low back and leg pain at the emergency room of Halifax Memorial Hospital on 21 November 1996. At that appointment and in subsequent appointment with a chiropractor, Dr. Wayne S. Horn, as well as two orthopedists, Dr. E.O. Marsigli and Dr. David C. Miller, plaintiff has reported the onset of back pain after being hit and knocked down by a large pipe valve at work on 12 November 1996.
26. Plaintiff gave a similar history of injury to the St. Paul adjuster to whom he ultimately gave a recorded statement on 20 November 1996.
27. Plaintiff has not given any health care provider a history of back injury inconsistent with that of being struck in the chest or abdomen by a pipe at work on 12 November 1996, while working for defendant-employer
28. Nevertheless, the undersigned do not find plaintiff's testimony credible. In examining the statements given by plaintiff in comparison to his testimony at trial, the undersigned find too many glaring inconsistencies and discrepancies in the evidence to lend credibility to plaintiff's allegations. It is also important to note that plaintiff's version of the alleged incident is not corroborated in major part by any witnesses at the hearing.
29. Based upon irreconcilable variations, inexplicable inconsistencies and multiple discrepancies in the evidence presented by plaintiff to support this claim, and his demeanor before the Deputy Commissioner, the undersigned do not find his testimony credible. There is no corroborating evidence of an incident on 12 November 1996 which is credible. The inconsistencies and discrepancies concern such matters as the time of the incident, the weight of the pipe involved, and the location on plaintiff's body where the pipe or valve struck him.
30. For example, plaintiff claimed in his testimony that he had retrieved a piece of equipment from a co-worker after the alleged accident or at approximately 11:00 a.m. Earlier, however, plaintiff asserted the alleged accident occurred between 11:30 a.m. and noon. He then changed his testimony when confronted under cross-examination with the inconsistency between his testimony at the hearing and his recorded statement that the incident occurred between 10:30 and 11:30 a.m.
31. In his recorded statement to the carrier, plaintiff stated that the pipe he was trying to install hit him in the chest. During the hearing, however, plaintiff initially stated that the pipe hit him "right in the center" of his navel. When confronted with the inconsistency at trial, plaintiff asserted he had told the adjuster during his recorded statement that he was hit "right in between" his waist and his chest. There are no such words in the recorded statement.
32. Plaintiff told the adjuster who took his statement, that the pipe which hit him weighed between 250 and 350 pounds. On direct examination at the hearing, before the Deputy Commissioner, plaintiff insisted that the valve which hit him weighed 800 pounds. When confronted with the contradiction, he admitted that the valve did not weigh 800 hundred pounds, but offered no explanation for this inconsistency between his recorded statement and his testimony.
33. In his recorded statement and at the emergency room on 21 November 1996, it was plaintiff's contention that he started having back pain the day after the alleged incident on 12 November 1996. He told his chiropractor, Dr. Horn, approximately a week later, however, that his symptoms appeared the night of the alleged incident. At trial, plaintiff initially stated that he was "a little sore" in his back by the time his shift ended on 12 November 1996. Later, during his testimony, plaintiff stated he was "hurting" so badly by the end of the shift, that he declined any overtime work in front of Mr. Hubbard. Later during the hearing, plaintiff recalled his back pain starting when he woke up on 13 November 1996.
34. Plaintiff told Dr. Horn that two co-workers had witnessed the alleged pipe valve incident. At the hearing, before the Deputy Commissioner, plaintiff only identified one witness, co-worker Leon Beatty, who has no recollection of the incident. In fact, Mr. Beatty recalls a pipe valve hitting him (Beatty) on 11 November 1996.
35. Plaintiff introduced into evidence Exhibit #18, a letter reportedly written by another co-worker, Mike Walters. The author of that letter states that he witnessed the alleged accident. Plaintiff had never before stated or written that Mr. Walters was a witness to the alleged incident. The author of Exhibit #18 states that plaintiff's foremen, Mr. Hubbard, came over to the alleged accident scene and that plaintiff reported the incident to him at that time. This is in direct contradiction to plaintiff's statements that he did not report the alleged incident to Mr. Hubbard until sometime later on 12 November when he encountered Mr. Hubbard at a water cooler. Plaintiff has never asserted that Mr. Hubbard came to the alleged accident scene. Mr. Walters denied having written the letter at the hearing. According to a handwriting expert who was present in Raleigh at the hearing on 18 December 1997, the letter was written in Walter's handwriting. It is irrelevant to the outcome of the case who actually wrote the letter, as the content of the letter is contradicted by the testimony of other witnesses.
36. Neither plaintiff's refusal to give a recorded statement to the insurance company adjuster nor his refusal to attend an appointment with a physician arranged by the employer on 14 November has been adequately explained. His refusal to submit to urine drug screen testing remains a puzzle even after plaintiff was directly questioned by Deputy Commissioner Hoag at the hearing before her.
37. Initially, at the hearing before the Deputy Commissioner, plaintiff claimed that a valve weighing 800 pounds swung toward him, hitting him in his navel, knocking him ten feet back and causing him to fall to the floor. Despite the impact, plaintiff apparently immediately stood up and continued to work. When questioned further about the weight of the valve, plaintiff claimed that he pushed the pipe back, presumably after it hit him and before he fell to the ground some ten feet away. This testimony is inconsistent with his earlier testimony that, when he saw the pipe swinging through the air toward him, he threw his hands up over his face.
38. Plaintiff's co-worker, Mr. Beatty tells a different tale altogether. At the hearing, Mr. Beatty alleged that from approximately 8:00 a.m. until approximately noon on 12 November 1996, plaintiff and he worked together to install a piece of pipe. After the pipe was ready for installing and during the actual installation process, plaintiff sat on cross bracing some four to six feet above the ground and operated a "come-along" to jack the pipe up, while he (Mr. Beatty) stood on the ground and held the pipe to help guide it in place. Plaintiff is certain a "come-along" was not used.
39. Mr. Beatty asserts that on 11 November, the pipe he and plaintiff maneuvered, twisted and bumped him in the chest, causing him to momentarily let of the pipe and step back. He then took hold of the pipe again, and the process continued until its completion. He was not knocked back, did not fall down and was not injured when the pipe twisted. Plaintiff observed the pipe to twist and bump Mr. Beatty.
40. Each of the inconsistencies discussed may only amount to a part of the testimony. Each inconsistency however highlights a pattern of behavior. Plaintiff has no consistent story to tell even taking account of his tendency to exaggerate. The most reasonable explanation for the many, many conflicting details is that an incident did not occur on 12 November involving a pipe valve and plaintiff. Plaintiff has not proven by a preponderance of the competent, credible evidence that he was injured by accident on 12 November 1996 in the course and scope of working for defendant-employer.
41. Plaintiff produced a number of witnesses at trial, none of whom could completely substantiate his own version of the incident. Mr. Harrison corroborates plaintiff's allegations in part. However, Mr. Harrison also believed any incident which occurred, took place in the evening, contrary to all other testimony.
42. In weighing the credibility of the witnesses, the undersigned find that of the foreman, George Hubbard, most credible and that of Leon Beatty credible. Close inspection of their testimony, especially in light of their demeanor of the witness stand, leads to a conclusion that these two men told the truth under oath. Their testimony is internally consistent and each corroborates the other. For example, Mr. Beatty testified unequivocally that he and plaintiff were using a "come-along" to jack up the pipe that day because a chainfall, which plaintiff claims they were using, was not available. Mr. Hubbard also testified without hesitation that they were using a "come-along" because they said that was all they could find to do the job and, in his opinion, that was one of the reasons it took them almost four hours to do a two-hour job.
43. Mr. Hubbard's testimony about what he observed each time he checked on the progress of the job he had given plaintiff and Mr. Beatty to do that day also corroborates Mr. Beatty's testimony. Mr. Beatty stood on the ground and guided the pipe while plaintiff sat on "x-bracing" some four or more feet above him and operated the "come-along" to jack the pipe up. Mr. Hubbard said that each time he checked on the job they were doing, after they had bolted it up and put the chokers on, plaintiff was sitting on the cross bracing using the "come-along" to steady the valve, while Mr. Beatty was on the ground holding the base of the pipe at the flange and guiding it.
44. Mr. Beatty and Mr. Hubbard are no longer employed by defendant-employer and have no prospect or desire of being so employed again. Although not necessary to deny this claim, their testimony strengthens such a decision.
45. Mr. Hubbard, who has known plaintiff for some 20 years and joined him in activities outside the workplace from drinking together in bars to fishing together, readily testified that plaintiff was a hard worker who worked just about every day and was a "real good top helper". When asked by plaintiff's counsel about plaintiff's reputation for truthfulness in the community, however, Mr. Hubbard just as readily testified that plaintiff did not have a good reputation for being truthful.
 *************
Based on the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of witnesses. The Deputy Commissioner who conducts the hearing, "is the best judge of the credibility of witnesses because [she] is a first hand observer of witnesses whose testimony [she] must weigh and accept or reject." Sanders v.Broyhill Furniture Industries, 124 N.C. App. 637, 639 (1996),quoting Pollard v. Krispy Waffle, 63 N.C. App. 354, 357 (1983);see also Taylor v. Caldwell Systems, 127 N.C. App. 542,491 S.E.2d 686 (1997).
2. Based upon his demeanor at the hearing as well as the unexplained and inexplicable discrepancies and inconsistencies in the evidence plaintiff offered to support his claim, including his own testimony, plaintiff's allegation that he hurt his back on the job with defendant-employer is not credible and is rejected. (Id.)
3. Plaintiff did not prove by a preponderance of the competent, credible evidence at trial that he sustained an injury by accident nor injured his back as the result of a specific traumatic event of his assigned work, in his employment with defendant-employer on 12 November 1996. N.C. Gen. Stat. § 97-2(6). Consequently, plaintiff is entitled to no workers' compensation benefits.
 *************
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Under the facts of this case and the law of this state, plaintiff's claim must be, and hereby is, DENIED.
2. Each side shall bear its own costs.
This the ___ day of August 1998.
 S/ ________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER
S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER